Melissa JONES, an infant under the age of 14 years, by her father and natural guardian, Richard JONES, Plaintiff,

v.

LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID CO., Defendant.

No. 85 CV 949.

United States District Court, E.D. New York.

Aug. 1, 1988.

---

Glaser, Shandel & Blitz, New York City (Richard E. Shandell, and Jane Thea, of counsel), for plaintiff.

Donovan Leisure Newton & Irvine, New York City (J. Peter Coll, Jr., Daniel J. Thomasch, and Janis R. Hirohama, of counsel), for defendant.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is a products liability action based on diversity of citizenship. 28 U.S.C. § 1332(a)(1). The defendant moves for summary judgment to dismiss the Complaint. Fed.R.Civ.P. 56(b). For the reasons discussed below, the motion is granted in part and denied in part.

### FACTS

Defendant, Lederle Laboratories ("Lederle"), is a division of American Cyanamid Company. Lederle manufactures Tri–Immunol, a diphtheria, tetanus, and pertussis ("DTP") vaccine. The Complaint alleges that the plaintiff, Melissa Jones, was administered this vaccine at the age of two-and-one-half months, and sustained severe and permanent neurological damage as a result. Lederle has moved for summary judgment on several grounds.

The parties agree that many of the facts are not in dispute. For purposes of diversity jurisdiction, the plaintiff is a citizen of New York and Lederle is a citizen of Maine and New Jersey. The amount in controversy exceeds $10,000.

### I. Background

#### A. *Pertussis and Pertussis Vaccines*

Well into the twentieth century, the disease of pertussis, commonly known as "whooping cough," was responsible for thousands of deaths annually in the United

States, mostly to infants. The disease is caused by *Bordetella pertussis*, a highly contagious bacterium.

In the 1940s, pertussis vaccines came into wide use. The first vaccine type was known as "whole-cell." In a whole-cell vaccine, entire dead pertussis cells are injected into the vaccine to induce immunity. Part, but not all, of the cell stimulates immune response. This part is known as the antigen. Other parts of the cell may contain neurotoxins, which do not induce immunity and may cause brain damage. For years, the scientific-medical community has been frustrated by its inability to determine precisely which part of the pertussis cell contains the antigen and which contains the toxins. As a result, the whole-cell vaccine, as its name suggests, consists of both antigenic and toxic material. Hence, the vaccine as administered stimulates immunity to pertussis, but at the fearsome risk of causing neurological damage.

In 1949, the federal Food and Drug Administration ("FDA") first licensed use of the whole-cell vaccine as a component of the DTP vaccine. The DTP vaccine also includes diphtheria and tetanus antigens. In contrast to the pertussis component of the vaccine, the biology of these cells is well understood. Thus, while the antigen in these cells is included in the vaccine, the potentially adverse reactants, the toxins, are left out. This DTP vaccine, as modified since the 1940s, is manufactured by Lederle under the tradename Tri–Immunol.

Since the 1940s, two other types of pertussis vaccine have been marketed. The first, the so-called "split-cell" design, was marketed by Eli Lilly & Company ("Lilly") from 1960–76 under the trade name Tri–Solgen. The split-cell vaccine contained pertussis cells that had been fragmented by a chemical process. Debris from some of the cell was discarded, although both antigens and toxins remained in the vaccine. After discontinuing production of Tri–Solgen, Lilly sold the right to produce it to a third party. After an abortive attempt to procure licensing from the FDA in 1982, this company elected not to make further attempts to license it. Because the

FDA refused to certify Tri–Solgen, it would have been a crime to have manufactured and sold it in 1979. *See* 21 U.S.C. §§ 331(d), 333(a), 355(a).

The other type of vaccine, known as "acellular," has been marketed in Japan since 1981. It has not been marketed in the United States. In an acellular vaccine, a protein component from the whole cell is purified in part and placed in the vaccine. The rest of the cell is discarded. Acellular vaccines also contain toxins.

In the United States, DTP is administered to infants and young children via a series of inoculations and booster shots. This program has dramatically reduced the incidence of pertussis. In 1934, there were over 250,000 reported cases of pertussis in the United States, and 7500 deaths caused by the disease. By the 1980s, there were, at most, 3000 cases and twenty annual deaths.

As mentioned previously, however, administration of the vaccine can produce undesirable side-effects. There is evidence that whole-cell vaccines can cause severe and permanent neurological damage. *See* Edwards, Lawrence & Wright, *Diphtheria, Tetanus, and Pertussis Vaccine*, 140 Am. J. of Diseases of Children 867, 871 (1986); Leibel, *Pertussis Vaccination: Benefits and Risks*, Drug Therapy, Oct. 1984, at 46. No scientific study, however, has compared the incidence of permanent side-effects between whole-cell vaccines and the two other types.

Several studies and reports have compared *temporary* adverse reactions caused by the three types of vaccines. The earliest study was carried out in 1967 by a Dr. Russell J. Blattner. This "Blattner Study" concluded that Lederle's whole-cell vaccine caused statistically significant greater incidence of temporary reaction than Lilly's split-cell design for pain and irritability among infant males, for swelling among infant females, and for temperature rise among all infants. There is evidence that, as early as 1964, Lederle knew that the split-cell design was less reactive than Tri–Immunol. Internal Lederle memoranda over the following decade reflect this fact.

Later studies have examined rates of temporary reaction between whole-cell and acellular vaccines, and have concluded that whole-cell is more reactive. *E.g.*, Edwards, *et al.*, *supra*, at 871 (whole-cell vaccine produced more temporary fever, pain, agitation, abnormal gait, and irritation at vaccination site than did acellular vaccine); Lewis, Cherry, Holroyd, Baker, Dudenhoeffer & Robinson, *A Double–Blind Study Comparing an Acellular Pertussis–Component DTP Vaccine with a Whole–Cell Pertussis–Component DTP Vaccine in 18–Month–Old Children*, 140 Am. J. of Diseases of Children 872, 873 (1986) (whole-cell vaccine caused more swelling, redness, and tenderness than did acellular vaccine).

There is evidence that the whole-cell vaccine contains more toxins than does the acellular type. *See id.* at 874; Sato, Kimura & Fukumi, *Development of a Pertussis Component Vaccine in Japan*, Lancet, Jan. 21, 1984, at 124. In addition, there is evidence that the acellular vaccine is at least as effective as the whole-cell vaccine in immunizing infants against pertussis. *See* Aoyama, Murase, Kato & Iwata, *Efficacy of an Acellular Pertussis Vaccine in Japan*, J. Pediatrics 180, 182 (1985); Edwards, *et al.*, *supra*, at 869–70.

### B. *FDA Licensing*

In the United States, vaccine manufacturers are regulated by the FDA pursuant to the Public Health Service Act, as amended, 42 U.S.C. § 262, and the federal Food, Drug and Cosmetic Act, as amended, 21 U.S.C. § 301 *et seq.* The regulations promulgated by the FDA are quite detailed. *See generally* 21 C.F.R. Subchapter F.

In order to market any vaccine, a manufacturer must receive both an establishment license and a product license. *See id.* § 601.1. In order to procure an establishment license, the manufacturer must, *inter alia*, pass an inspection conducted by the FDA. *See id.* § 601.10(a). To retain the license, the manufacturer must receive FDA permission concerning any change in manufacturing methods or product labeling. *See id.* § 601.12(b).

To procure a product license, the manufacturer must comply with various regulations designed to ensure that the product is safe, effective, and correctly branded. *See id.* §§ 601.20(a), .25. A plethora of rules establish the procedure for review of drugs submitted for licensing. *See generally id.* § 601.25(a)–(c). In addition, standards for safety, effectiveness, and labeling are established. These regulations provide, in relevant part:

(1) Safety means the relative freedom from harmful effect to persons affected, directly or indirectly, by a product when prudently administered, taking into consideration the character of the product in relation to the condition of the recipient at the time. Proof of safety shall consist of adequate tests by methods reasonably applicable to show the biological product is safe under the prescribed conditions of use, including results of significant human experience during use.

(2) Effectiveness means a reasonable expectation that, in a significant proportion of the target population, the pharmacological or other effect of the biological product, when used under adequate directions, for use and warnings against unsafe use, will serve a clinically significant function in the diagnosis, cure, mitigation, treatment, or prevention of disease in man ...

(3) The benefit-to-risk ratio of a biological product shall be considered in determining safety and effectiveness.

. . . .

(5) Labeling shall be clear and truthful in all respects and may not be false or misleading in any particular. It shall comply with section 351 of the Public Health Service Act and sections 502 and 503 of the Federal Food, Drug, and Cosmetic Act, and in particular with the applicable requirements of ... this chapter.

*Id.* § 601.25(d).

A manufacturer wishing to market a pertussis vaccine must also comply with several specific requirements. *See generally id.* §§ 620.1–.6. These requirements define the vaccine as "an aqueous preparation of either killed whole *Bordetella pertussis*

bacteria or a fraction of *Bordetella pertussis* bacteria. The vaccine may be precipitated or adsorbed and may be combined with other antigens." *Id.* § 620.1 (emphasis in original).

The regulations establish standards for propagation, content, and detoxification of bacteria, *see id.* § 620.2, as well as potency, *see id.* § 620.3. In addition, methods of testing for potency and toxicity are prescribed. *See id.* §§ 620.4, .5. Finally, the general labeling requirements for biological drugs are set forth at 21 C.F.R. §§ 610.-60–.65.

As of June 1979, the Lederle DTP vaccine Tri–Immunol satisfied all of the relevant requirements, and was licensed by the FDA. The vaccine was shipped to physicians with a label that read, in relevant part:

CONTRAINDICATIONS

Immunization injections should be deferred during the course of any acute illness. Routine immunization with this product should not be attempted if the child has a personal or family history of central nervous system disease or convulsions. The occurrence of a severe reaction following administration of this product consisting of high fever (39°C or above), somnolence, screaming, shock, convulsions, encephalopathy or thrombocylopenia is a contraindication to further use of this vaccine. The clinical judgment of the responsible physician should prevail at all times.

The occurrence of any type of neurological symptoms or signs following administration of this product is an absolute contraindication to further use.

. . . .

WARNING

This product is not recommended for immunizing persons over six years of age. Do not attempt routine immunization if the child has a personal or family history of central nervous system disorders or convulsions. Should any symptomatology related to neurological disorders develop following administration do not attempt further administration of pertussis antigen. The development of "excessive

screaming syndrome" is an absolute contraindication for any further use of pertussis vaccine.

. . . .

ADVERSE REACTIONS

. . . .

Neurological disorders such as encephalopathy, possibly due to the pertussis component, have been reported to occur rarely following the injection of this product and they may be fatal or result in permanent damage to the central nervous system.

. . . .

Routine immunization should be postponed or avoided in patients with acute infections or a personal or family history of neurological disturbances.

II. Circumstances Surrounding the Inoculation

The plaintiff, Melissa Jones, was born on March 24, 1979. Her pediatrician, Dr. Fred Grello, examined plaintiff on May 21. Diagnosing her as suffering from an upper respiratory infection, Dr. Grello prescribed and administered Rondec, a decongestant. Plaintiff's mother administered Rondec to plaintiff over the following two days.

Within a few days, the plaintiff began to experience intermittent stiffening of the arms and legs. Her mother telephoned Dr. Grello on several occasions. He opined that plaintiff was suffering from an "immature nervous system," and that the episodes were unrelated to the Rondec.

Dr. Grello next saw the plaintiff on June 6. On that date, he administered to her an oral polio vaccine and the DTP vaccine Tri–Immunol. Within four days, the plaintiff began to suffer severe seizures. She was taken to a hospital, where she was diagnosed as having a seizure disorder. Although the disorder is now controlled by medication, it is apparent that plaintiff suffers permanent physical and neurological damage. She is mentally retarded, cannot speak, is unable to tend to herself, and has poor vision and hearing.

In December 1980, the plaintiff commenced a malpractice action in state court

against Dr. Grello. The complaint alleged that Grello had negligently administered the vaccine to plaintiff despite his knowledge of (1) nervous system disorders in her family; (2) the neurological symptoms that plaintiff had displayed; and (3) the presence in plaintiff of an upper respiratory infection. The case was settled in September 1985.

### III. The Complaint and the Motion

The instant Complaint was filed in February 1985 in New York State Supreme Court, Suffolk County. Lederle timely removed the action in March 1985 under 28 U.S.C. §§ 1441 and 1446.

The Complaint alleges that plaintiff suffered permanent neurological damage as a result of the inoculation that she received on June 6, 1979. Four claims are set forth.

Count I alleges that Lederle was negligent in manufacturing, testing, selling, and distributing Tri-Immunol, and that it failed to warn adequately of the dangers posed by the vaccine. Count II alleges breach of the implied warranties of merchantability and fitness for a particular purpose. Count III alleges strict liability. Count IV alleges breach of an express warranty of fitness.

After the close of discovery Lederle made this motion for summary judgment. Lederle's initial set of arguments focuses on the negligence and strict liability claims. Lederle argues first that they are preempted under the Supremacy Clause of the federal Constitution. Even if not preempted, Lederle argues, the claims must be dismissed because they fail as a matter of state law. Lederle contends that, to the extent the claims are based on defective design, testing, or manufacture, they must fail because in 1979 Tri-Immunol was "reasonably safe" as a matter of law. Lederle also contends that the claims must fail for lack of proximate cause. Lederle's final argument is that the breach of warranty claims should be dismissed.

### DISCUSSION

#### I. State Law Issues

I will first address the state law issues since the constitutional question should be reached only as a last resort. *See Lorillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978).

### A. *Summary Judgment Standard*

A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The movant must identify those material facts that it argues are not in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once it has done so, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e). A "genuine" dispute exists only if the evidence could permit a reasonable jury to return a verdict for the adverse party. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510.

### B. *General Considerations*

Because this is a diversity action, the Court must follow the choice-of-law of rules of the forum state, New York. *See Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, —— U.S.——, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Entron, Inc. v. Affiliated FM Insurance Co.*, 749 F.2d 127, 131 (2d Cir. 1984). The plaintiff is a New York resident and the incident giving rise to this action occurred in New York. Under these circumstances, the parties do not dispute that New York would apply its substantive law. *See Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985).

The New York Court of Appeals has recognized four distinct theories of liability

for injury caused by an allegedly defective product: express contract, implied contract, negligence, and strict liability. *Voss v. Black & Decker Manufacturing Co.*, 59 N.Y.2d 102, 106, 450 N.E.2d 204, 207, 463 N.Y.S.2d 398, 401 (1983) (quoting *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 400, 335 N.E.2d 275, 277, 373 N.Y.S.2d 39, 41 (1975)). The Complaint alleges claims under each theory.

### C. *Strict Liability*
#### 1. Defects

■ To prevail on a strict products liability claim, the plaintiff must show that (1) the product was defective in some way; (2) at the time of the injury, the product was being put to its normal and intended use; (3) if the plaintiff himself used the product, he could not, by reasonable care, have discovered the defect and apprehended the danger it posed; and (4) by using reasonable care, the plaintiff could not have otherwise avoided injury. *Voss*, 59 N.Y.2d at 106, 450 N.E.2d at 207, 463 N.Y.S.2d at 401. The threshold question, of course, is whether the product was defective. New York law recognizes three types of defects.

The first is a manufacturing defect. *E.g., Victorson*, 37 N.Y.2d at 400–04, 335 N.E.2d at 276–79, 373 N.Y.S.2d at 41–44. A defectively manufactured product deviates in some material way from its design or performance standards. The issue is whether the product was rendered unsafe by an error in the manufacturing process. In this case, plaintiff has presented no evidence to suggest that Tri–Immunol was defectively manufactured. Accordingly, that part of the Complaint sounding in strict liability due to defective manufacture must be dismissed.

The second type of strict liability defect recognized by New York is a design defect. *Voss*, 59 N.Y.2d at 107, 450 N.E.2d at 207, 463 N.Y.S.2d at 401. To prove defective design the plaintiff must show that the product, as designed, was not reasonably safe. *Id.*, 450 N.E.2d at 207, 463 N.Y.S.2d at 401. A product is not reasonably safe if, at the time of its manufacture, a reasonable person with knowledge of the defect

would conclude that the risks inherent in the product's design outweighed the utility of marketing it. *See id.* at 108, 450 N.E.2d at 208, 463 N.Y.S.2d at 402.

Lederle has presented uncontroverted evidence that Tri–Immunol is of great utility—its use has nearly eradicated in the United States the dreaded disease of whooping cough. Defendant argues that Tri–Immunol does not cause permanent neurological damage in infants into whom it is injected, and is endorsed by scores of medical experts. Lederle's argument is that, due to the efficacy of Tri–Immunol and its imprimatur as a "safe" product by the medical community, it cannot, as a matter of law, be characterized as "not reasonably safe." I disagree.

In determining whether a product is not reasonably safe, the fact-finder must weigh risks against utility and cost. *See id.* at 109, 450 N.E.2d at 208, 463 N.Y.S.2d at 402. In evaluating risks, the fact-finder may consider whether the product could have been designed safer at a cost that would not have detracted unacceptably from its utility. *See id.*, 450 N.E.2d at 208, 463 N.Y.S.2d at 402. This standard takes many factors into account, including technological progress. For example, a fifty-year-old design that at its inception represented the leading edge of technology and safety might today be unreasonably unsafe because of the emergence of safer, cost-competitive, alternative designs.

In essence, this is what plaintiff asserts made Tri–Immunol unreasonably unsafe by 1979. She does not argue that the drug was unreasonably unsafe during, say, the 1940s. She contends, however, that improvements in technology after that time resulted in two designs—split-cell and acellular—that are safer and as effective as Tri–Immunol and that could have been marketed at an acceptable cost by Lederle in 1979.

Bearing this in mind, I turn first to the split-cell design. Defendant does not argue that in 1979 there was a cost difference between production of the whole-cell and split-cell vaccines. Efficacy and safety, however, are closer questions.

Plaintiff argues that the split-cell design causes fewer incidents of permanent neurological damage than does the whole-cell design because it is less toxic. She does not present evidence of studies comparing the long-term effects of the two designs, nor does she present direct evidence that the split-cell design contains fewer toxins. She relies instead on (1) the Blattner Study, which found that the whole-cell vaccine caused significantly greater rates of temporary adverse reaction in infants than the split-cell vaccine, and (2) the opinion of Dr. Mark Thoman, plaintiff's proferred expert witness, who concludes that the split-cell design is less toxic, based on the Blattner Study. In response, defendant has attacked the credibility of Dr. Thoman, and argues that evidence of long-term effects cannot be inferred from the Blattner Study.

After reviewing the record, I conclude that the evidence presented by plaintiff is sufficient for a fact-finder to infer that the split-cell design causes fewer incidents of permanent neurological damage than does Tri–Immunol. It would be unreasonable to tax the plaintiff for the gaps that have existed for over thirty years in the knowledge of the scientific-medical community. There is clearly sufficient evidence for the jury to infer that the whole-cell vaccine is more toxic than the split-cell design based on rates of temporary reaction. It would not be an unwarranted inference for the jury to take the next step and find that Tri–Immunol poses the greater risk of long-term harm due to this greater toxicity.

Defendant's next argument is that the split-cell design was not a safer alternative in 1979 because the only pertussis vaccine licensed by the FDA in 1979 was the whole-cell design. This is factually true, but not dispositive. The split-cell design, Tri–Solgen, *was* marketed from 1960 to 1976. Lilly and Tri–Solgen's present owner attempted unsuccessfully to procure FDA licensing during the 1970s and early 1980s. The apparent reason for the FDA's unwillingness to license the drug was the inability of its would-be manufacturers to show, by use of large-scale samples, that it was as immunogenic as Tri–Immunol. Interestingly enough, all relevant parties at that time apparently agreed that Tri–Solgen was less toxic than Tri–Immunol.

Plaintiff has submitted evidence—in the form of Dr. Thoman's opinion and internal Lederle documents from the mid–1970s—that Tri–Immunol and Tri–Solgen are of equal efficacy. Plaintiff does not dispute that it is the duty of the FDA to deny licensing for drugs whose efficacy has not been demonstrated pursuant to the applicable regulations. She argues, however, that in 1976 Lederle could have purchased the right to produce Tri–Solgen, and would have been able to show the FDA that it was as effective as Tri–Immunol. Under those circumstances, she asserts, the FDA would have licensed Tri–Solgen by 1979.

Although this connection is somewhat tenuous, I conclude that it is sufficiently supported by the evidence to present a question of fact. Under the relevant statutes and regulations, the FDA decides whether to approve for human consumption drugs submitted by private parties. Its unwillingness to license Tri–Solgen reflected the inability of Tri–Solgen's owners to demonstrate the drug's efficacy. A jury, however, could find that Tri–Solgen was as effective as Tri–Immunol, and that it would have been licensed had its owners arranged for sufficient large-scale studies.

I now turn to the acellular design. Plaintiff has presented evidence sufficient to find that this vaccine is as effective as Tri–Immunol, costs roughly the same, and is less toxic. The sole question is whether it would have been permissible and feasible to have marketed the drug in the United States in 1979.

Although the applicable regulations do not make express reference to acellular vaccine, *see* 21 C.F.R. § 620.1, I conclude that the FDA would license the design if its manufacturer complied with all of the applicable rules. I also find that plaintiff has presented evidence sufficient to find that the drug satisfies all of these standards. The drug was first marketed in Japan in 1981. The issue is whether it could have been marketed here two years earlier.

Plaintiff's expert witness, Dr. Thoman, states that research into acellular vaccines began in the 1960s, and that Lederle itself quickly abandoned a half-hearted effort to develop the design. Once Lilly removed Tri-Solgen from the market, he states, Lederle had a monopoly on the DTP vaccine market, and failed to improve the vaccine. While Lederle lagged, a Japanese company, applying the available technology, brought the acellular design to market. Dr. Thoman opines that, had Lederle not abandoned research and development on acellular vaccines, it could have marketed such a vaccine by 1979. Not surprisingly, Lederle has submitted evidence that this would have been an impossible feat.

Based on Dr. Thoman's opinion and the fact that the acellular design was developed in the 1960s, I conclude that plaintiff has presented a question of fact as to whether acellular design could have been marketed in 1979. For the foregoing reasons, a reasonable jury could find that the split-cell and acellular designs were safer, and at least as effective and economical, as the whole-cell design in 1979. Applying the balancing test, the jury could therefore find that Tri-Immunol was a defective product at the time plaintiff received her DTP inoculation.

Lederle has failed to suggest why the jury could not hold it liable on a negligent design theory based on the above evidence. Accordingly, summary judgment to dismiss those parts of the Complaint based on design defect and negligent design must be denied.

■ The third type of product defect recognized by New York is the failure to provide adequate warnings regarding use of the product. *E.g., Torrogrossa v. Towmotor Co.,* 44 N.Y.2d 709, 376 N.E.2d 920, 405 N.Y.S.2d 448 (1978). The notion here is that the product, as designed and manufactured, is dangerous, but not unreasonably so. But this reasonable danger, when coupled with inadequate warnings about it, renders the product *unreasonably* unsafe. *See Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 61–62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd,* 52 N.Y.2d 768, 417 N.E.2d

1002, 436 N.Y.S.2d 614 (1980). To escape liability, the manufacturer must provide an adequate warning about the dangers of using its product. *See Smith v. Hub Manufacturing,* 634 F.Supp. 1505, 1508 (N.D.N.Y.1986). Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent. *Wolfgruber,* 72 A.D.2d at 62, 423 N.Y.S.2d at 95.

Should the jury in this case determine that Tri-Immunol was not defectively designed, plaintiff's strict liability argument will shift to this inadequate warning theory. The general rule concerning prescription drugs is that the manufacturer must furnish the warning to the plaintiff's physician. *See Cooley v. Carter-Wallace, Inc.,* 102 A.D.2d 642, 644, 478 N.Y.S.2d 375, 377 (4th Dep't 1984); *Wolfgruber,* 72 A.D.2d at 60–61, 423 N.Y.S.2d at 96.

The adequacy of the warning typically is a question of fact for the jury. *See McFadden v. Haritatos,* 86 A.D.2d 761, 762–63, 448 N.Y.S.2d 79, 81 (4th Dep't 1982). In this case, the contraindication and warning notices make reference to "a personal or family history of central nervous system disease or convulsions," and the adverse reactions notice refers to "a personal or family history of neurological disturbances."

Viewing the label as a whole, I conclude that there is no legitimate dispute as to whether it contained a clear warning about the severe consequences that could result from injecting this plaintiff with Tri-Immunol. *See Wolfgruber,* 72 A.D.2d at 62–63, 423 N.Y.S.2d at 97–98. Accordingly, a jury could not find that Tri-Immunol was defectively labeled. To the extent that the Complaint alleges injury due to failure to warn, it will be dismissed.

### 2. Proximate Cause

■ Strict liability addresses the nature of the product rather than the conduct of the manufacturer. If plaintiff satisfies all of the elements of a claim, the manufacturer is held liable regardless of its culpability. To prevail on a strict liability claim, however, the plaintiff must still show that the defective product was the proximate

cause of her injury. *Voss*, 59 N.Y.2d at 109, 450 N.E.2d at 209, 463 N.Y.S.2d at 403.

Proximate cause in the strict liability context means that the defect was a "substantial factor" in causing the injury. *Id.* at 109–10, 450 N.E.2d at 209, 463 N.Y.S.2d at 403; *Wolfgruber*, 72 A.D.2d at 62, 423 N.Y.S.2d at 97. For purposes of this motion, defendant concedes that causation is a disputed fact. It argues, however, that plaintiff cannot show proximate cause. Defendant asserts that the proximate cause of plaintiff's injuries was Dr. Grello's malpractice, which consisted of failing to diagnose plaintiff's neurologic condition and then administering the vaccine.

Plaintiff's preexisting condition and the adequacy of Dr. Grello's diagnosis are issues that must be answered by the jury. In any event, I am not persuaded that a finding of negligence on the part of Dr. Grello would mean, as a matter of law, that the defects in Tri–Immunol were not also a substantial factor in causing plaintiff's injuries. Accordingly, the motion for summary judgment due to lack of proximate cause is hereby denied.

### D. *Breach of Warranty*

Under New York law, a plaintiff who alleges injury due to a defective product may also sue for breach of warranty, implied or express. The Complaint alleges that defendant breached the implied warranties of merchantability and of fitness for a particular purpose. Defendant argues that Tri–Immunol was merchantable because it met its purpose, which was to protect inoculants from pertussis.

■ The implied warranty of merchantability is breached if the good is not fit for the ordinary purpose for which it is used. *See* N.Y.U.C.C. § 2–314(2)(c) (McKinney 1964). Where the plaintiff proceeds under a strict liability theory, the warranty of merchantability claim is treated the same as the strict liability claim. *See Micallef v. Miehle Co.*, 39 N.Y.2d 376, 387, 348 N.E.2d 571, 578–79, 384 N.Y.S.2d 115, 122 (1976). Accordingly, for the reasons discussed in the product defect discussion, summary judgment on this claim must be denied.

■ Defendant's final argument on the state claims is that plaintiff's claim for express warranty must be dismissed because defendant made no representations to plaintiff regarding Tri–Immunol. Under New York law, a plaintiff alleging breach of express warranty must show, *inter alia*, that the seller made "an affirmation of fact or promise" regarding the product. *Friedman v. Medtronic, Inc.*, 42 A.D.2d 185, 190, 345 N.Y.S.2d 637, 643 (2d Dep't 1973). In this case, the Court is unable to discern representations made by defendant to plaintiff regarding Tri–Immunol. Accordingly, the express warranty claim will be dismissed.

### II. Preemption

■ I now turn to defendant's preemption argument. Defendant contends that, to the extent plaintiff's claims are based on defective design, they must be dismissed because they are preempted by federal law.

The principle of preemption is rooted in the Supremacy Clause of the Constitution, which reads:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Medical Laboratories*, 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Validly promulgated federal regulations have the same preemptive effect as federal statutes. *See Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). Naturally, state common law is

as subject to preemption as state statutes. *E.g., Cipollone v. Ligget Group, Inc.,* 789 F.2d 181, 185–87 (3d Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

Defendants concede that Congress has not *expressly* preempted state-law claims based on defective design of Tri–Immunol. It argues, however, that preemption may be *inferred* in several different ways. Before addressing each, I will review some general principles concerning preemption, and will examine what defendant contends is the extent of preemption here.

The claims advanced by plaintiff are grounded in the common law as it has evolved in New York. The common law is but one component of the police power, which is reserved to the states under the Constitution. *See Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376 (state regulation of health and safety matters is a traditional component of the police power). Laws adopted pursuant to the police power are not superseded under the Supremacy Clause unless Congress or the agency clearly manifests an intention to do so. *Id.*

The preemption urged by defendant in this case is rather drastic. Defendant does not argue that the state-law tort remedies are replaced by a federal recovery scheme, as was provided by Congress after 1986. *See* National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99–660, § 311, Secs. 2110–2123, 100 Stat. 3755, 3758–74 (codified as amended at 42 U.S.C. §§ 300aa–10 to –23). Defendant argues instead that federal law completely eliminates recovery in such cases to the extent plaintiff alleges defective design. Bearing in mind that, as of 1979, neither Congress nor the FDA had affirmatively indicated an intent to preempt state law to the drastic extent advanced by defendant, I turn to defendant's arguments.

### A. Total Preemption: Comprehensive Federal Regulation and Dominant Federal Interest

The intent to preempt the entire body of state law in a given area may be inferred where either (1) the scope of federal legis-

lation is so comprehensive that it is reasonable to infer that no room has been left for state laws or (2) the federal interest so dominates the field that the federal system precludes application of state law on the subject. *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375. Obviously, the two concepts are closely intertwined. Defendant argues that in this case preemption may be found on either ground.

Because contagious diseases do not respect state boundaries, the responsibility for their prevention and eradication has traditionally rested on the federal government. *See* Subcomm. on Science and the Environment of the House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Report on Childhood Immunizations 43 (1986). The federal government discharges this responsibility by administering a nationwide anti-pertussis inoculation program through various federal and state agencies. The FDA reviews the vaccine and its labeling and eventually decides whether to license its production. The Federal Centers for Disease Control grant federal funds to state authorities in order to administer the vaccines. *See* 42 U.S.C. § 262.

While the federal interest in this area is strong and has been manifested by comprehensive regulations, it does not automatically follow that state laws providing remedies for persons injured by the vaccine have been eradicated.

As previously noted, there is no indication that in enacting the inoculation program, Congress intended to preempt state laws touching on the effectiveness and safety of the pertussis vaccine. The comprehensiveness of this federal scheme, standing alone, does not warrant an inference that Congress or the FDA intended complete preemption. *See Hillsborough County,* 471 U.S. at 716–19, 105 S.Ct. at 2376–78. For these reasons, I am unable to conclude that the regulatory scheme here impliedly preempts state tort law in this area, which is a traditional province of state power.

### B. Partial Preemption: Conflict with Federal Law

Even where Congress has not completely preempted state law in a specific area,

state law is displaced "to the extent it *actually conflicts* with federal law." *Id.* at 713, 105 S.Ct. at 2375 (emphasis added). Conflict may occur where either (1) it is physically impossible to comply with both state and federal law or (2) state law hinders the achievement of Congress' purpose in passing the law. *Id* Defendant argues that both conflicts exist here. I disagree.

Defendant points out that, in 1979, Tri–Immunol was the only type of DTP drug licensed by the FDA, and that the manufacture of an alternative design would have been a criminal offense. A verdict for plaintiff on her design defect claim would necessarily involve a finding that defendant should have marketed a split-cell or acellular design in 1979, rather than Tri–Immunol. Defendant argues that since neither alternative design was licensed in 1979, the logical result of a verdict for plaintiff would be a conclusion that defendant should not have marketed any pertussis vaccine in New York in 1979, conduct that would have hindered the federal government's goal of preventing pertussis. I reject this argument because it misapprehends the structure of the regulatory scheme, as well as the nature of plaintiff's products liability claims.

To prevail on her claims, plaintiff must show, *inter alia,* that it would have been feasible and cost-effective for defendant to have manufactured a competing design in 1979. To rebut plaintiff's feasibility argument, defendant will be permitted to introduce evidence of the FDA regulations and the circumstances surrounding the FDA's failure to license Tri-Solgen.

This evidence, however, will not necessarily be dispositive. The regulatory scheme is designed to produce a safe and effective pertussis vaccine. Because of the myriad drugs submitted for licensing, as well as its relatively limited resources, the FDA must depend on would-be manufacturers to perform the bulk of the work involved in procurement of a license. As a result, the agency takes the drugs and manufacturers as it finds them. While its goal is to oversee inoculation with the best possible vaccine, it is limited to reviewing only those drugs submitted by various manufacturers, regardless of their flaws. When a vaccine is eventually licensed, it indicates that the agency is satisfied with the drug's quality and with the ability of its manufacturer to produce it.

There is no indication, however, that licensing is intended to denominate the vaccine as nondefective within the meaning of products liability law. It is best read as a selection from the limited universe of competing designs and producers presented to the agency. While it does confer on the producer the right to market the vaccine, it does not prevent parties from recovering based on injuries caused by the drug, as designed with agency approval.

Imposition of liability due to product defect will necessarily involve a finding that, in 1979, defendant should have marketed either an acellular or split-cell design. Concededly, either act would have been illegal under then-existent regulations.

The illegality, however, will be due to *the failure of defendant* to present to the agency and procure licensing of, an alternative design, where defendant possessed the knowledge and wherewithal to do so. The jury must necessarily find that, not only was Tri–Immunol defective in 1979, but that a competing design would have been licensed by that time had it been presented to the FDA. Viewed in this manner, defendant's "physical impossibility" argument collapses because it would have been possible to have marketed a design in 1979 different from Tri–Immunol as licensed. Defendant's reasoning, which rests on its own failure to market a nondefective drug, is therefore rejected.

Finally, I reject defendant's argument that a verdict for plaintiff would conflict with Congress' goal of nationwide child immunization against pertussis. It is not immediately apparent how the field of products liability, which is designed to protect consumers, conflicts with this goal.

Defendant's argument, that a verdict for plaintiff will involve a finding that children in New York should not have received DTP inoculations in 1979, falls wide of the mark. The essence of a successful products liabili-

ty claim in this area is that defendant could have marketed a superior design in that year. Obviously, this is consistent with the goals behind the nationwide inoculation program.

When Congress or the appropriate agency wishes to preempt a given area of state law, they certainly have no history of being bashful in saying so. *See Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375. Here, despite the web of statutes and regulations concerning the pertussis vaccine, there is nothing to indicate an intention to supplant state tort remedies based on defects in that vaccine. Accordingly, the Court declines to infer preemption of these state laws, which repose in the bosom of the police power.

## CONCLUSION

For the foregoing reasons, summary judgment to dismiss plaintiff's claims to the extent they are based on defective manufacture and failure to warn are granted. The motion for summary judgment to dismiss Count IV is granted. In all other respects the motion is denied.

SO ORDERED.