**Melissa JONES, an infant under the age of 14 years, by her father and Natural Guardian, Richard JONES, Plaintiff,**

v.

**LEDERLE LABORATORIES, a DIVISION OF AMERICAN CYANAMID CO., Defendant.**

No. 85 Civ. 0949.

United States District Court, E.D. New York.

Feb. 26, 1992.

Glaser, Shandell & Blitz by Richard E. Shandell, New York City, for plaintiff.

Donovan Leisure Newton & Irvine by Daniel J. Thomasch and Stephen G. Foresta, New York City, for defendant.

MEMORANDUM, JUDGMENT AND ORDER

WEINSTEIN, District Judge:

FACTS AND PROCEDURAL HISTORY

Melissa Jones is a severely retarded twelve-year-old girl. This action, brought on Melissa's behalf by her father, alleges that her condition results from receiving defendant's DTP vaccine at the age of two and one half months. *See Jones v. Lederle Laboratories,* 695 F.Supp. 700 (E.D.N.Y. 1988). The DTP vaccine is intended to

immunize children against diphtheria, tetanus, and pertussis (whooping cough). In this country, the vaccine traditionally has been given to children in a series of five injections at ages two, four, six and eighteen months, and at five years.

Shortly before Melissa received her first DTP shot her parents reported that the child experienced intermittent stiffening of the limbs in a manner that suggested seizures. Nevertheless, on June 6, 1979 her pediatrician administered the DTP vaccine. Three days later Melissa had another seizure. On the fourth day after the vaccination she suffered a series of more serious seizures for which she was hospitalized. She subsequently was diagnosed as being severely brain damaged.

The DTP vaccine given to Melissa is manufactured and sold by the defendant under the name Tri–Immunol. Tri–Immunol includes a "whole cell" pertussis vaccine. The whole cell vaccine consists of pertussis cells which have been killed by heat and thus do not cause whooping cough. When injected into the body, they stimulate the production of antibodies that prevent infection by future exposure to live pertussis cells. The risks associated with this process are controverted. Pertussis cells contain toxins that can cause fever, local swelling and pain in children who are inoculated. Whether these toxins also pose a risk of neurological damage is disputed by the parties.

In light of the vaccine's perceived utility in eliminating whooping cough—a disease that in the 1940s caused thousands of infant deaths annually ín this country—the federal Food and Drug Administration approved use of the whole cell vaccine in 1943 despite the risks it was then thought to pose.

In 1980, Melissa's parents brought a malpractice action against the pediatrician for administering the DTP vaccine in a manner contrary to instructions on the vaccine package insert. The suit resulted in a substantial settlement.

This action was commenced in February 1985 in New York State Supreme Court. Recovery was originally sought on theories of defective design and manufacture, failure to warn, express and implied warranty and negligence. Defendant removed on the basis of diversity jurisdiction.

The gist of plaintiff's claims is that defendant produced an unreasonably unsafe vaccine that caused Melissa's brain damage. The vaccine is alleged to have been unreasonably unsafe because, according to the plaintiff, an alternative pertussis vaccine could have been produced and sold at the time of Melissa's inoculation that was equally effective and less risky.

Defendant maintains that its product was not negligently designed or manufactured nor unreasonably unsafe. It claims that there is no evidence that an efficacious alternative vaccine could have been produced commercially in this country in 1979. Defendant also contends that plaintiff cannot prove general or specific causation because current scientific knowledge has not established any causal connection between the whole cell pertussis vaccine and neurologic disorders. According to the defendant, Melissa Jones' pre-inoculation seizures indicated a neurological disorder present at birth that worsened over time for reasons unrelated to her inoculation.

In August of 1988, this court issued a memorandum and order in response to defendant's motion for summary judgment. *See Jones v. Lederle Laboratories*, 695 F.Supp. 700 (E.D.N.Y.1988). Applying New York law, the court granted summary judgment for defendant with respect to the manufacturing defect, failure to warn and express warranty claims. *Id.* at 706–09. The court also held that triable issues of fact remained as to the design defect, negligent design and breach of implied warranty claims. Since New York law treats the implied warranty and design defect claims as equivalents, *see id.* at 709, the substantive issues left for trial were: (1) was the vaccine defectively or negligently designed and (2) did the improper design cause plaintiff's injuries?

Trial was before a jury. After the presentation of plaintiff's case and again after the defense rested, defendant moved under Rule 50 for judgment as a matter of law.

Defendant also moved to strike the testimony of Dr. Mark Geier, an expert witness for plaintiff, as inadmissible under Federal Rules of Evidence 702, 703 and 403, and to strike the testimony of plaintiff's other expert, Dr. Leon Charash, under Rules 703 and 403. The court reserved decision on the motions until after the jury returned its verdict.

On December 23, 1991 the jury returned a $3,250,000 verdict for the plaintiff. Seventy-five percent of the fault was apportioned to the pediatrician and twenty-five percent to Lederle.

Defendant's motions for judgment as a matter of law and to exclude the testimony of Dr. Geier and Dr. Charash have been renewed. In light of plaintiff's failure to provide any evidence that an alternative vaccine could have been developed and approved by the FDA in 1979, defendant's Rule 50 motion must be granted.

## LAW

■ Rule 50 was recently amended to abandon what the advisory committee thought to be the loaded terminology of the "directed verdict." *See* Fed.R.Civ.P. 50(a) advisory committee's note to 1991 Amendment [hereinafter Note to 1991 Amendment]. Nevertheless, the traditional standards governing a Rule 50 motion have not changed. *Id.* The court will grant such a motion "where the evidence, viewed most favorably to the party against whom the judgment is entered, would not be sufficient to support a verdict in that party's favor." *Shore v. Parklane Hosiery Co.,* 565 F.2d 815, 819 (2d Cir.1977), *aff'd,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

> A directed verdict is proper only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."

*Fiacco v. City of Rensselaer,* 783 F.2d 319, 329 (2d Cir.1986) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). These same standards apply whether the motion is entertained prior to or after the verdict. *See Note to 1991 Amendment, supra; Brink's Inc. v. City of New York,* 546 F.Supp. 403, 406 (S.D.N.Y.1982). Denial of a motion for summary judgment does not prevent a court from granting a subsequent Rule 50 motion by the same party with respect to the same claim. *See* 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 56.04[2] (1991).

■ Under New York product liability law, a product is defectively designed if it was not reasonably safe, i.e., "if, at the time of ... manufacture, a reasonable person with knowledge of the defect would conclude that the risks inherent in the product's design outweighed the utility in marketing it." *Jones,* 695 F.Supp. at 706 (citing *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983)); *see also DeRosa v. Remington Arms Co.,* 509 F.Supp. 762, 768 (E.D.N.Y.1981). Plaintiff's own expert admitted that the benefits of the product outweighed its risks, so the risk-utility calculus with respect to defendant's product, taken by itself, is not at issue in the case.

■ The existence of a superior product—for example, one which produces equal or greater benefits at less cost or risk, or greater benefits at equal cost or risk—will, however, support a design defect verdict even if the product would otherwise be considered not defective. *Voss,* 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204; *Cover v. Cohen,* 61 N.Y.2d 261, 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984). Defendant contests this assertion by arguing that New York product liability law does not require a manufacturer to produce the best product possible or to "act as an insurer with respect to its product." *DeRosa,* 509 F.Supp. at 768. Both of these claims may be true. Their accuracy, however, is entirely consistent with the notion that the existence of a feasible and superior alternative product may lead a court or jury to conclude that the utility of the inferior product no longer outweighs its risks in light of the fact that

the risks are unnecessary to achieve the same or greater utility. This is the view of the New York Court of Appeals in both the *Voss* and *Cover* cases. *See Cover*, 61 N.Y.2d at 266–67, 473 N.Y.S.2d 378, 461 N.E.2d 864 (existence of defect "determined by whether a reasonable person with knowledge of the potential for injury of the product and of the available alternatives, balancing the product's risks against its utility and costs and against the risks, utility and cost of the alternatives, would have concluded that it should not have been marketed...."); *Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204 ("[i]n balancing the risks inherent in the product ... against its utility and cost, the jury may consider several factors ... includ[ing] ... the availability of a safer design") (citations omitted). Such a view is also supported by common sense. The law may not require manufacturers to make the best conceivable product, but it would be remiss not to encourage the employment of superior designs at hand.

For the jury verdict to stand, then, the evidence must have been sufficient to allow a reasonable juror to infer that the following propositions are more likely true than not:

(1) the whole cell pertussis vaccine contains toxins capable of causing brain damage;

(2) the whole cell vaccine caused such damage to Melissa Jones;

(3) as of 1979, a safer and at least equally efficacious alternative vaccine could have been designed, produced, and marketed in this country.

## APPLICATION OF LAW TO FACTS

For purposes of this memorandum, viewing the evidence most favorably to the plaintiff, the testimony of plaintiff's two experts can withstand a Rule 50 motion with respect to propositions (1) and (2). While the court was unimpressed with the qualifications, veracity and bona fides of these experts, it need not pass on the issue of whether their testimony met the minimum standards of Rules 403, 702 and 703 of the Federal Rules of Evidence.

Dr. Geier testified that the whole cell pertussis vaccine contained dangerous toxins that conceivably could cause neurological damage. He also testified that an alternative "acellular" vaccine first developed and used in Japan is equally effective and poses less risk of such harm. Dr. Charash testified that Melissa's condition resulted from her inoculation. This testimony arguably complied with Articles IV and VII of the Federal Rules of Evidence.

■ The difficulty with plaintiff's case is that no acceptable evidence was offered to support a jury finding as to the probable truth of proposition (3): the availability of a safer vaccine on June 6, 1979, when Melissa was inoculated.

Plaintiff's argument hinges on the fact that, about two years after Melissa was inoculated, various forms of the alternative acellular vaccine came into use in Japan. By removing and purifying certain components of the pertussis cell rather than using the whole cell, the acellular method attempts to minimize the possible toxic side effects of the vaccine. The Japanese versions of the acellular vaccine have been used in that country on children age two and older since 1981. There is evidence that the acellular design produces fewer side effects and may be more efficacious than the whole cell vaccine when administered to children age eighteen months or older. *See, e.g.*, 56 Fed.Reg. 63,409 (Dec. 4, 1991) (noting that current research suggests such a view).

Plaintiff's design defect argument involves three claims: that theoretical and practical knowledge sufficient to design an acellular vaccine existed in 1979; that defendant or someone else had the ability to manufacture such a vaccine in 1979 in light of that knowledge; and that, in 1979, such a vaccine could have met FDA requirements for use as a vaccine for infants of Melissa's age—about two months. The jury had no evidence to support any of these claims.

As to the state of theoretical and practical knowledge, the evidence is undisputed that, in the 1970s, theoretical difficulties

were preventing scientists around the world from producing a better and safer pertussis vaccine. Plaintiff's experts took the view that all of the pieces to the puzzle of a non-whole cell vaccine were available in the 1960s or 1970s. This is a misdescription of the historical facts. It was not until 1979 that the recipe for an effective acellular vaccine was developed in the pioneering efforts of the Japanese. The originality of this work was testified to by experts called by both plaintiff and defendant.

As to the manufacture and marketing of an acellular vaccine, the Japanese first distributed their acellular vaccine in December of 1981. This distribution was predicated on tests and results that would not have complied with strict United States testing standards. Under the less stringent Japanese standards, moreover, the Japanese vaccine was approved only for use in children age two and above. To this day, pediatricians in the United States overwhelmingly recommend administering the first *whole cell* vaccine at age two months, roughly the time at which Melissa received her shot.

After ten years of testing in Japan, the Japanese vaccine has now been demonstrated to be safe for two-year-old children. Further tests conducted in this country have satisfied federal regulators that the vaccine will probably be effective when used for children aged 18 months or older. In light of these tests, the FDA recently amended its regulations to allow use of the Japanese acellular vaccine in the fourth and fifth shots in the DTP vaccination sequence. *See* 59 Fed.Reg. 63,409 (Dec. 4, 1991); N.Y. Times, Dec. 19, 1991, at B22. Testing of equivalent American acellular vaccines for younger children, developed after 1979, will be conducted in European countries where a control population of infants not yet inoculated with the whole cell vaccine is available.

Thus, even today, years of further development and testing will be required before a more advanced vaccine for two-month-old infants will be available in this country. There was simply no basis for the jury to conclude that, by 1979, the defendant could have developed, produced and proven to the FDA's satisfaction the efficacy and safety of an acellular vaccine for use on Melissa Jones.

The case illustrates some of the strengths and weaknesses of the American system for marketing drugs. Requiring strict proof of safety—both to comply with FDA regulations and to avoid tort liability—slows the availability of new products. The result may well be that dangers will be enhanced during the necessarily extended developmental period. But these results are attributable to the way in which scientists usually solve problems—through incremental, peer reviewed experiments—and to the regulatory system, not to any delict on the part of this defendant.

## CONCLUSION

The evidence is essentially uncontested that defendant could not have produced and marketed the safer vaccine that plaintiff's experts say would have avoided Melissa Jones's injuries. Once this conclusion is reached, there is nothing left to the case. The warnings were adequate. The production was not defective—it was in accordance with the design. No safer alternative design was available. The vaccine, with its possible drawbacks, saved far more infant lives than it put at risk.

No basis for liability has been shown. Defendant's motion for judgment as a matter of law is granted. The case is dismissed. No costs or disbursements.

So ordered.