Keisha HUNT

v.

**McNEIL CONSUMER HEALTHCARE, et al.**

Civil Action No. 11–457.

United States District Court, E.D. Louisiana.

Signed Jan. 17, 2014.

270

Patty Ann Trantham, Robert Lyle Salim, Salim–Beasley, LLC, Natchitoches, LA, Russell S. Briggs, Fibich, Hampton, Leebron, Briggs & Josephson, LLP, Jay Hodges Henderson, Jay Henderson, PLLC, Kenneth Thomas Fibich, Fibich, Hampton, Leebron, Briggs & Josephson, LLP, Sara J. Fendia, Law Offices of Sara J. Fendia, Houston, TX, Val Patrick Exnicios, Liska, Exnicios & Nungesser, New Orleans, LA, for Keisha Hunt.

Kari L. Sutherland, Paul Victor Cassisa, Jr., Butler, Snow, O'Mara, Stevens & Cannada, Oxford, MS, James B. Irwin, Douglas J. Moore, Kelly E. Brilleaux, Timothy Farrow Daniels, Irwin Fritchie Urquhart & Moore, LLC, New Orleans, LA, Kenneth P. Conour, Preuss, Shanagher, Zvoleff & Zimmer, Matthew P. Smith, Vernon I. Zvoleff, Drinker, Biddle & Reath, LLP, San Francisco, CA, for McNeil Consumer Healthcare, et al.

### *ORDER AND REASONS*

JANE TRICHE MILAZZO, District Judge.

Before the Court are two Motions filed by Defendants: (1) Motion for Partial Summary Judgment (R. Doc. 242), and (2) Motion *in Limine* to Exclude Dr. Arthur Sanford (R. Doc. 290). For the following reasons, the Motion for Partial Summary Judgment is GRANTED IN PART. Plaintiff's design defect claim shall remain pending, but only insofar as it alleges dexibuprofen as a safer alternative to Children's Motrin. The Motion *in Limine* is also GRANTED IN PART.

Dr. Sanford may not opine as to general or specific causation. His testimony shall be limited to assessing Plaintiff's injuries and discussing potential courses of treatment.

## BACKGROUND

This a pharmaceutical products liability action. Plaintiff Keisha Hunt suffered personal injury after ingesting Children's Motrin—a drug manufactured by Defendants McNeil Consumer Healthcare and Johnson & Johnson. Plaintiff alleges Children Motrin caused her to contract a rare skin disease known as Stevens–Johnson Syndrome and/or Toxic Epidermal Necrolysis ("SJS/TEN"). Plaintiff subsequently filed suit under the Louisiana Products Liability Act ("LPLA"), La.Rev.Stat. § 9:2800.54 *et seq.*, alleging Children's Motrin is defectively designed and contains inadequate warnings of potential health problems. The instant Motions followed.

## LEGAL STANDARD

I. *Summary Judgment—Fed. R. Civ. P. 56*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (2012). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor. *Coleman v. Hous. Indep. Sch. Dist.,* 113 F.3d 528 (5th Cir.1997). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake,* 47 F.3d 1459, 1462 (5th Cir.1995). Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial." *Johnson v. Deep E. Tex. Reg. Narcotics Trafficking Task Force,* 379 F.3d 293, 301 (5th Cir.2004) (internal citations omitted). "We do not ... in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Badon v. RJR Nabisco, Inc.,* 224 F.3d 382, 394 (5th Cir.2000) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)). Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." *Boudreaux v. Banctec, Inc.,* 366 F.Supp.2d 425, 430 (E.D.La.2005).

II. *Admissibility of Expert Testimony—Fed. R. Evid. 702*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. The current version of Rule 702 reflects the Supreme Court's deci-

sions in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The threshold inquiry is whether the expert possesses the requisite qualifications to render opinion on a particular subject matter. *Wagoner v. Exxon Mobil Corp.,* 813 F.Supp.2d 771, 799 (E.D.La.2011); *see also Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir.1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."). Having defined the permissible scope of the expert's testimony, a court next inquires whether the opinions are reliable and relevant. *See United States v. Valencia,* 600 F.3d 389, 424 (5th Cir.2010).

In undertaking this tripartite analysis, courts must give proper deference to the traditional adversary system and the role of the jury within that system. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* As the "gatekeeper" of expert testimony, *id.* at 597, 113 S.Ct. 2786 the trial court enjoys broad discretion in determining admissibility. *Wellogix, Inc. v. Accenture, L.L.P.,* 716 F.3d 867, 881 (5th Cir.2013).

## LAW AND ANALYSIS

Defendants' Motion for Partial Summary Judgment seeks dismissal of Plaintiff's design defect claim. The Motion *in Limine* seeks to preclude Dr. Sanford from offering expert testimony regarding medical causation and damages. The Court addresses the dispositive Motion first.

### I. *Motion for Partial Summary Judgment*

In this diversity case, the Court applies the substantive law of the forum state. *Johnston & Johnston v. Conseco Life Ins. Co.,* 732 F.3d 555, 562 (5th Cir.2013). Under Louisiana law, the LPLA provides the exclusive remedy against manufacturers in a products liability action. La.Rev.Stat. § 9:2800.52; *Demahy v. Schwarz Pharma, Inc.,* 702 F.3d 177, 182 (5th Cir.2012). To maintain a successful action under the LPLA, a plaintiff must prove: "(1) that the defendant is a manufacturer of the product; (2) that the claimant's damage was proximately caused by a characteristic of the product; (3) that this characteristic made the product 'unreasonably dangerous'; and (4) that the claimant's damage arose from a reasonably anticipated use of the product." *Stahl v. Novartis Pharms. Corp.,* 283 F.3d 254, 261 (5th Cir.2002) (citing La.Rev.Stat. § 9:2800.54). The plaintiff bears the burden of proving all elements. La.Rev.Stat. § 9:2800.54(D).

As to third element, a product can be "unreasonably dangerous" (i) in construction or composition; (ii) in design; (iii) for failure to provide an adequate warning; and (iv) for failure to conform to an express warranty. La.Rev.Stat. § 9:2800.54(B). Defendants seek dismissal of Plaintiff's claim that Children's Motrin is unreasonably dangerous in design.

La. Rev. Stat. § 9:2800.56 provides in part that:

A product is unreasonably dangerous in design if, at the time it left its manufacturer's control:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.

Thus, the statute requires Plaintiff to prove (i) that a safer alternative design existed at the time Defendants manufactured Children's Motrin, and (ii) "that the risk avoided by using the alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utili-

ty)." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 700–01 (5th Cir.2012).

One of Plaintiff's experts—Dr. Randall Tackett—identified three possible alternative designs: (1) dexibuprofen, (2) acetaminophen, and (3) non-pharmacologic modalities. Plaintiff has since clarified she only intends to offer evidence as to dexibuprofen. Thus, the Court does not address the other two alternatives suggested by Dr. Tackett.

It is undisputed that dexibuprofen has not been approved for sale by the Food and Drug Administration ("FDA"). In fact, the FDA rejected a "New Drug Application" (often referred to as an "NDA") for dexibuprofen in 1994. Thus, it is—and always has been—illegal to sell dexibuprofen in the United States. *See Mut. Pharm. Co., Inc. v. Bartlett*, —— U.S. ——, 133 S.Ct. 2466, 2470, 186 L.Ed.2d 607 (2013) ("[D]rug manufacturers must gain approval from the ... [FDA] before marketing any drug in interstate commerce.") (citing 21 U.S.C. § 355(a)). Given that it would have been illegal to sell dexibuprofen at the time they manufactured Children's Motrin, Defendants argue dexibuprofen cannot be considered an alternative design under the LPLA as a matter of law.[1] The Court disagrees.

Defendants contend an alternative design under § 9:2800.56 must be "legal, available, and feasible." This narrow interpretation is belied by the both the words of the statute and the jurisprudence interpreting the statute. The plain language of the statute only requires the alternative design to have "existed" at the time the product left the manufacturer's control. La. Rev. Stat. § 9:2800.56(1). The use of the word "existed" was a conscientious decision by the legislature to depart from pre-LPLA law, which allowed a design defect claim predicated on alternatives that were, *inter alia,* "feasible." *See Sisk v. Sears, Roebuck & Co.*, 959 F.Supp. 337, 339 (E.D.La.1996). Thus, with

respect to the first element of Plaintiff's design defect claim, she need only show that the alternative design was "in existence."[2] *Moyer v. Siemens Vai Servs., LLC,* No. 11–3185, 2013 WL 3293668, at *9 (E.D.La. June 28, 2013).

This, of course, begs the question of what is meant by the term "existed." Given the lack of guidance by Louisiana courts, a leading commentator attempted to answer this question in 1989:

> 'Existed' does not mean that the alternative design must have been manufactured and in actual use when the manufacturer distributed his product. Nor does it mean that the alternative design must have been feasible, i.e., could have been employed even if was not, at that time. But 'existed' does mean that the alternative design must at least have been conceived at the time the product left its manufacturer's control, because one of the purposes of the first element of section 2800.56 (when read with section 2800.59(A) ...) is to show that the manufacturer had a realistic choice as to design.

John Kennedy, *A Primer on the Louisiana Products Liability Act,* 49 La. L.Rev. 565, 572 (1989). This explication of the term "existed" may not be dismissed as the hackneyed musings of an academic, as Defendants would suggest. Kennedy's article has been recognized by at least two sections of this Court as an authoritative interpretation of § 9:2800.56(1). *See Wilson v. Hovart Corp.*, No. 95–2279, 1996 WL 117502, at *2 (E.D.La. Mar. 15, 1996); *Moyer,* 2013 WL 3293668, at *9.

Defendants focus on the last sentence of the excerpted portion of Kennedy's article. Defendants argue they did not have a *"realistic* choice" of marketing dexibuprofen because to do so would violate federal law. This argument fails for two reasons. As a preliminary matter, Kennedy did not state

---

1. Defendants have not asserted an impossibility preemption argument, *i.e.,* that federal drug regulations directly conflict with the LPLA. Given that preemption is an affirmative defense, *PLIVA, Inc. v. Mensing,* —— U.S. ——, 131 S.Ct. 2567, 2578, 180 L.Ed.2d 580 (2011), the Court will not raise preemption *sua sponte. See Kiser v. Johnson,* 163 F.3d 326, 328 (5th Cir.1999).

2. To the extent the concept of feasibility is relevant at all, it is more appropriately considered as part of the risk-utility test outlined in § 9:2800.56(2).

that "realistic choice" is a necessary component of the definition of "existed." *See Kennedy*, 49 La. L.Rev. at 572. He merely explained "that *one* of the purposes of" § 9:2800.56 is to provide the manufacturer with a realistic choice as to design. *Id.* (emphasis added). Moreover, even assuming *arguendo* that the choice of an alternative design *must* be realistic, Defendants' argument still fails. Whether a choice is "realistic"—and, more broadly, whether Plaintiff can satisfy her burden of proof under § 9:2800.56—is a question of fact. *See Morris v. United Servs. Auto. Ass'n*, 756 So.2d 549, 557 (La.Ct.App.2d Cir.2000); *Ougel v. Pharmacia, Inc.*, No. 94–184, 1995 WL 92345, at *3 (E.D.La. Mar. 3, 1995). Dr. Tackett opined the FDA would now grant an NDA for dexibuprofen. This testimony suffices to create a genuine issue of material fact.

The Court's conclusion that lack of FDA approval is not dispositive finds support in the jurisprudence.[3] *See Madden v. Wyeth*, No. 03–CV–0167–BD, 2005 WL 2278081, at *2 (N.D.Tex. Sept. 14, 2005) ("That the FDA has not approved dexibuprofen for use in the United States is not dispositive as to whether the drug constitutes a safer alternative design.") (citing *Jones v. Lederle Labs., A Div. of Am. Cyanamid*, 695 F.Supp. 700, 707 (E.D.N.Y.1988)).[4] In *Newman v. McNeil Consumer Healthcare*, the Northern District of Illinois confronted the precise issue before the Court today: whether the existence of dexibuprofen can support a design defect claim for a plaintiff injured by Children's Motrin. No. 10 C 1541, 2013 U.S. Dist. LEXIS 113440, at *36–37 (N.D.Ill. Mar. 29, 2013). The court answered this question in the affirmative and denied summary judgment, finding that the plaintiff had presented sufficient evidence that the defendants could have successfully applied for FDA approval of dexibuprofen. *Id.* at *37; *accord Lederle*, 695 F.Supp. at 707 (denying summary judgment on pharmaceutical design defect claim where plaintiff offered evidence that pro-

posed alternative would have been approved by FDA).

## II. *Motion in Limine to Exclude Dr. Sanford*

Plaintiff retained Dr. Sanford as an expert witness in this case. According to his report, Dr. Sanford intends to offer three opinions at trial: (1) that Children's Motrin causes SJS/TEN (general causation); (2) that ingestion of Children's Motrin caused Plaintiff to develop SJS/TEN (specific causation); and (3) that Plaintiff will incur significant medical expenses and require future medical care as a result of her injuries (damages). The Court addresses the admissibility of each opinion separately.

### A. *General Causation*

■ Defendants challenge both Dr. Sanford's qualifications to render an opinion on general causation and the reliability of the methodology underlying that opinion. Because Dr. Sanford's opinion is utterly devoid of any of the traditional hallmarks of reliability, the Court does not address Dr. Sanford's qualifications. Accordingly, Dr. Sanford is precluded from opining at trial as to general causation.

■ "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir.2012). Many factors bear on an expert's reliability. In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony. *See Daubert*, 509 U.S. at 592–96, 113 S.Ct. 2786. "These factors include whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir.2002). The Supreme Court

---

**3.** Admittedly, these decisions apply the law of the forum state; not the LPLA.

**4.** *But see Wolfe v. McNeil—PPC, Inc.*, 773 F.Supp.2d 561, 572 (E.D.Pa.2011) (finding lack of FDA-approved alternative to ibuprofen relevant in design defect claim).

has cautioned that the reliability analysis must remain flexible: the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167 (internal quotation marks omitted). Thus, "not every *Daubert* factor will be applicable in every situation ... and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 326 (5th Cir.2004). The proponent of the expert's testimony bears the burden of proving reliability by a preponderance of the evidence. *Paz v. Brush Engineered Materials, Inc.,* 555 F.3d 383, 387–88 (5th Cir.2009).

■ Defendants argue Dr. Sanford's general causation opinion should be excluded because it relies almost exclusively on the reports and opinions of other experts. As many courts have recognized, expert testimony based solely or primarily on the opinions of other experts is inherently unreliable. *Cholakyan v. Mercedes–Benz USA, LLC,* 281 F.R.D. 534, 544 (C.D.Cal.2012) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions."); *accord Am. Key Corp. v. Cole Nat'l Corp.,* 762 F.2d 1569, 1580 (11th Cir.1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); *Tokio Marine & Fire Ins. Co., Ltd. v. Norfolk & W. Ry. Co.,* No. 98–1050, 98–1077, 172 F.3d 44, 1999 WL 12931, at *4 (4th Cir.1999) (unpublished) ("[O]ne expert may not give the opinion of another expert who does not testify."). It is only when the expert undertakes some independent investigation of the underlying opinions that his testimony may be considered reliable. *See Lightfoot v. Hartford Fire Ins. Co.,* No. 07–4833, 2011 WL 39010, at *4–5 (E.D.La. Jan. 4, 2011); *JRL Enters., Inc. v. Procorp Assocs., Inc.,* No. 01–2893, 2003 WL 21284020, at *7–8 (E.D.La. June 3, 2003).

It is clear Dr. Sanford's "opinion" on general causation is based almost exclusively on the opinions of other experts. Dr. Sanford testified at his deposition that the majority of his report was copied verbatim from other reports. The Court's independent comparison of the reports confirms this testimony. In fact, Dr. Sanford's copying was so scrupulous that he maintained typographical errors from the original reports.

As discussed *supra,* lack of originality is not dispositive. The crucial issue is whether Dr. Sanford independently evaluated or verified the opinions upon which he relies. Dr. Sanford conceded in his deposition that he did not read most of the material cited in the opinions nor verify the data referenced therein. Thus, it is clear that Dr. Sanford did not undertake the kind of independent evaluation that *Daubert* and Rule 702 require. He merely parroted the opinions and conclusions of other experts whose testimony is shielded from cross examination. The Court cannot allow Dr. Sanford's testimony into evidence without abdicating its role as gatekeeper. *See In re TMI Litig.,* 193 F.3d 613, 715–16 (3d Cir.1999) (finding that "expert's failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results"); *Lightfoot,* 2011 WL 39010, at *5 (finding opinion unreliable where expert failed to independently investigate the expert opinions upon which he relied); *Threet v. Corr. Health Care Mgmt. of Okla., Inc.,* No. 07–0943, 2009 WL 3335596, at *5–6 (W.D.Okla. Oct. 15, 2009) (same). Accordingly, Dr. Sanford may not offer testimony at trial regarding general causation.

### B. *Specific Causation*

■ The Court's analysis in the previous subsection applies with equal force to Dr. Sanford's opinion on specific causation. It is abundantly clear that the vast majority of this opinion was copied verbatim from the reports of other experts—reports which Dr. Sanford did not independently verify. The only quasi-original material is Dr. Sanford's summary of the onset of Plaintiff's injuries. Dr. Sanford notes Plaintiff was symptom-free before ingesting Children's Motrin but started to develop symptoms within hours after ingestion. Dr. Sanford's report indi-

cates Plaintiff's physical reactions to Children's Motrin are "consistent with the literature." But Dr. Sanford admitted he did not read all or most of this literature. In fact, the list of articles cited in the report was copied verbatim from the report of another expert. Because Dr. Sanford's opinion on specific causation is not based on a reliable scientific methodology, the only basis for that opinion is the close temporal connection between the ingestion of Children's Motrin and the onset of SJS/TEN symptoms. Yet as the Fifth Circuit has recognized, "correlation is not causation." *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir.2009). Thus, "courts must not allow evidence of temporal correlation to serve as a substitute for science-based causation evidence." *Id.* Accordingly, Dr. Sanford is precluded from offering expert testimony regarding specific causation.

### C. *Damages*

██ Dr. Sanford's report states Plaintiff suffered injuries to her eyes, skin, teeth, and genitalia. The report also states Plaintiff suffered psychological injury. Given the foregoing, Dr. Sanford opines Plaintiff will incur future medical expenses and require medical care. Defendants argue Dr. Sanford does not possess the requisite qualifications to render this opinion. The Court disagrees.

██ The Fifth Circuit has held that "[t]o qualify as an expert, the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir.2004) (alterations in original) (internal quotation marks omitted). Additionally, Rule 702 provides that an expert must be qualified by "knowledge, skill, experience, training or education." Fed.R.Evid. 702. "[A]n expert witness is not strictly confined to his area of practice, but may testify concerning related applications." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168–69 (5th Cir.2013) (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.1991)). In other words, an expert need not be "highly qualified" in order to offer testimony on a particular issue. *Huss*, 571 F.3d at 452. "Differences in ex-

pertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.; see also Wen Chyu Liu*, 716 F.3d at 168 ("A lack of specialization should generally go to the weight of the evidence rather than its admissibility.").

According to his expert report, Dr. Sanford has been a burn surgeon for over 14 years. He currently serves as an associate professor in the Department of Surgery at the Loyola University of Chicago, Strich School of Medicine. Dr. Sanford is certified in general surgery and surgical critical care by the American Board of Surgery, and is currently active in several professional societies. He has published over 25 articles in peer-review journals in the area of burn and wound care. Some of those articles discuss the treatment of SJS/TEN patients. Dr. Sanford has also treated hundreds of in-hospital burn victims, approximately seventy of whom suffered from SJS/TEN. He testified that it is commonplace for burn surgeons to treat SJS/TEN patients.

Given the foregoing, the Court finds Dr. Sanford sufficiently qualified to evaluate the injuries suffered by SJS/TEN patients like Plaintiff. Accordingly, Dr. Sanford may testify as to his assessment of Plaintiff's injuries and how those injuries can be treated. Defendants are free to challenge any perceived lack of specialization on cross-examination.

## CONCLUSION

For the reasons previously stated, the Motions are GRANTED IN PART.